UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

CLEO FIELDS

VERSUS

QBE SPECIALTY INSURANCE
COMPANY

CIVIL ACTION

19-209-SDD-SDJ

## RULING

Before the Court is the *Daubert Motion to Exclude Expert Report & Testimony of John W. Crawford*[1] filed by Defendant, QBE Specialty Insurance Company ("QBE"). Plaintiff Cleo Fields filed an *Opposition*,[2] to which QBE filed a *Reply*.[3] For the following reasons, the Court finds that the *Motion* shall be GRANTED.

**I.    FACTUAL BACKGROUND**

On June 28, 2016, lightning struck the home of Plaintiff Cleo Fields ("Fields"), causing property damage.[4] At the time, Fields' property was insured by QBE. QBE has paid Fields a sizeable amount for damages deemed by QBE to be "covered losses" under the policy.[5] In this suit, Fields contends that he has not been paid the full value of the insured losses and asserts that QBE has failed to properly adjust his claim in accordance with the policy and Louisiana law. Shortly after the lightning strike, Fields engaged a structural engineer, Michael Stein ("Stein"), who inspected the property alongside QBE's structural engineer on August 1, November 1, and November 29, 2016. Stein did not

---

[1] Rec. Doc. 24.
[2] Rec. Doc. 30.
[3] Rec. Doc. 45.
[4] Rec. Doc. No. 1-1, p. 3.
[5] Rec. Doc. No. 39, p. 4 (wherein Fields concedes that "Eventually, QBE paid [him] at various times a total of $1,018,412.00 'for covered losses' due to the lightning strike").

66423

prepare a written report.[6] Ultimately, after Fields filed suit against his insurer QBE, he retained John W. Crawford ("Crawford") to provide a report addressing the damages caused by the lightning strike and an estimate of the loss. Crawford's report and testimony are the subject of the instant *Motion*.

QBE moves to exclude Crawford's testimony and report, arguing that Crawford's opinions lack reliability and are not based upon scientific methodology. QBE maintains that Crawford's opinions are unsupported by any testing and are based upon a visual inspection conducted three years after the lighting strike, which renders them unreliable. QBE further argues that Crawford lacks the requisite qualifications to testify regarding lightning damage because he has no specialized knowledge of lightning damage and "has never been qualified as an expert to testify in a state or federal court regarding lightning damage."[7]

## II. *DAUBERT* STANDARD

Federal Rule of Evidence 702 provides the parameters for admissible expert testimony:

> A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

When a *Daubert* issue is raised, a district court may hold a hearing at which the expert opinion in question may be challenged.[8] However, when no hearing is held, "a

---

[6] Rec. Doc. No. 24-1, p. 1-2.
[7] *Id*. at p. 21.
[8] *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016).

66423

district court must still perform its gatekeeping function by performing some type of *Daubert* inquiry."[9] "At a minimum, a district court must create a record of its *Daubert* inquiry and 'articulate its basis for admitting expert testimony.'"[10]

The *Daubert* analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise and the subject of his testimony."[11] "District courts are to make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[12] The Fifth Circuit has noted that *Daubert* makes certain general observations intended to guide a district court's evaluation of scientific evidence. The nonexclusive list includes whether [a theory or technique] can be (and has been) tested, whether it has been subjected to peer review and publication, the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, as well as general acceptance."[13]

This Court has broad discretion in deciding whether to admit expert opinion testimony.[14] An expert witness's testimony should be excluded if the district court "finds that the witness is not qualified to testify in a particular field or on a given subject."[15]

---

[9] *Id.*
[10] *Id.* (quoting *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001)).
[11] *Kumho*, 526 U.S. at 150, *cited with approval in Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).
[12] *Carlson v. Bioremedi Therapeutic Sys., Inc.,* 822 F.3d 194, 199 (5th Cir. 2016)(cleaned up).
[13] *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997) (cleaned up).
[14] *See General Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997) (holding that appellate courts review a trial court's decision to admit or exclude expert testimony under *Daubert* under the abuse of discretion standard); *see also Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997) (holding "[d]istrict courts enjoy wide latitude in determining the admissibility of expert testimony"); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence.").
[15] *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir.1999).

Nevertheless, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[16]

### III.   CRAWFORD'S QUALIFICATIONS

A person qualified by "knowledge, skill, experience, training, or education"[17] may testify in the form of an opinion, provided the opinions are reliable and relevant, that is, if the opinions will provide assistance to the trier of fact. Crawford has a Bachelor of Science Degree in Civil Engineering from Texas A&M University.[18] He is licensed and has worked as a professional civil engineer in seven states, including Louisiana, Texas, Mississippi, Florida, Alabama, New York, and New Jersey.[19]  Crawford has worked as an expert forensic engineer and expert licensed general contractor since 1994.[20] Plaintiff points out that his areas of forensic consultation include "lightning damage assessments, hurricane damage assessments, construction disputes, design and failure analysis of commercial, residential and industrial structures including cause and origin reports, estimates to repair/rebuild damaged structures, product deficiencies as well as quality control on civil engineering projects."[21]

Movant argues that Crawford is unqualified to provide opinion testimony in the field of damages caused by lightning. The Court is persuaded by Plaintiff's response that it is not a "prerequisite that a person be previously qualified as an expert in a court of law, let alone, qualified as an expert in a field as discrete as lightning damage."[22]   The    Court

---

[16] *Huss v. Gayden,* 571 F.3d 442, 452 (5th Cir. 2009).
[17] FRE 702.
[18] Rec. Doc. 30-1, p. 257 (Exhibit 2).
[19] *Id*.
[20] *Id*. at p. 258.
[21] Rec. Doc. No. 30, p. 8.
[22] *Id*. at p. 9.

finds that Crawford is qualified by skill, experience, training and education to provide opinion testimony regarding the "extent of lightning related damages to the property and to provide an accurate cost estimate for repairs,"[23] which is what he was engaged to do. However, to find Crawford *qualified* to opine does not end the inquiry. To fulfill its gatekeeping function, the Court must test his opinions for relevance, reliability, and assistance to the jury. For the following reasons, the Court finds that Crawford's methodology in this case casts doubt on the reliability of his conclusions and, therefore, his opinion testimony shall be excluded.

### A. Crawford's methodology for determining electrical damage to electrical components

Crawford opines that:

> Power surges and heat traveled through the high and low voltage wiring, causing widespread damage to all electrical systems in the dwelling, including the elevator, generator, automation system, security system, telephone and intercom systems, security camera system, air conditioning systems, wine room refrigeration unit, and appliances.[24]

He concludes that complete replacement of these systems is required. This conclusion was reached upon a visual inspection of the property that was conducted three years after the lightning event, and after some (and possibly many) repairs had been made. QBE has made loss payments of $433,452.31 for dwelling damage and $500,000 for personal property.[25] It is unclear what repairs and replacements were made by the Plaintiff with the proceeds of these loss payments. What is clear, however, is that Crawford made no adjustment in his loss estimate for past repairs.[26] Crawford testified

---

[23] Rec. Doc. 23-12 (Crawford's Report), p. 2.
[24] *Id*. at p. 3.
[25] *See* QBE's *Statement of Undisputed Facts*, Rec. Doc. No. 23-2 (specifically facts 9 and 12), and Fields' *Response*, Rec. Doc. No. 39-6, wherein Fields admits that these amounts are correct and were paid.
[26] Rec. Doc. 23-14 (Deposition of Crawford), p. 40 ("Q: And then it sounds like that you indicated that some repairs and estimates had been performed already by the time you came out, correct?" A: Yes. Q: Okay.

66423

that, based in part on discussions with At Home Technology ("At Home"), the cost to replace the automation and audio visual components at Fields' residence is $228,670.89.[27] Tellingly, the Plaintiff had previously obtained multiple estimates totaling $114,351.06 from At Home to replace these components.[28] The wide gap in the cost replacement estimates alone is enough to cast doubt on the reliability of the Crawford estimate to replace the electrical components.

The reliability of Crawford's opinion that the electrical components are a total loss requiring compete replacement is further undermined by the absence of any testing of these components to determine functionality. His conclusion was reached solely upon visual inspection. He explains his methodology as follows:

> our office observed a charred section of roof decking, foam insulation, and rafters due to the subject lightning strike. Adjacent to the charred area were multiple high and low voltage wires servicing the electrical system, automation system, security system, and telephone system. The proximity of these wires to the strike location increases the probability that power surges and heat traveled through the high and low voltage wiring, causing widespread damage to all electrical systems in the dwelling including the elevator, generator, automation system, security system, telephone and intercom systems, and appliances.[29]

The Court finds that this visual inspection methodology is insufficient to reach the conclusion of damage to "the elevator, generator, automation system, security system, telephone and intercom systems, security camera system, air conditioning systems, wine

---

Did you note in your report anywhere the instances where repairs had already been completed? A: No, we did not. . .").
[27] Rec. Doc. No. 30-1, p. 295.
[28] Rec. Doc. 23-7, p. 353.
[29] Rec. Doc. 23-12, p. 7.

66423

room refrigeration unit, and appliances"[30] and the wiring which provides power supply to these components.[31]

## B. Opinions regarding Dwelling Damages

Crawford's opinions regarding the damage to the dwelling are again principally derived from his visual inspection three years after the damage-causing event. The Court finds that Crawford's failure to consider the nature and extent of prior repairs renders his estimates unreliable and is likely to lead to juror confusion. For example, Crawford opines that the dwelling's slate roof is a total loss and requires complete replacement. However, Crawford's firm[32] also did an inspection and assessment of the Plaintiff's home in connection with damage claims following Hurricane Gustav. The 2009 estimate to replace the slate roof following Hurricane Gustav was $231,250.57.[33] The photographs produced in this case raise a question as to whether the roof was replaced following Gustav or whether spot repairs were made instead.[34] Crawford testified that at the time of his 2019 inspection in this case he did not know how old the roof was.[35] He relied on the Plaintiff's testimony that he replaced the roof after Hurricane Gustav.[36] An expert may rely upon the testimony and statements of others as a basis for his opinions. However, the photos of the roof after Gustav and the roof in 2019 are strikingly similar.[37] The Court finds that the photographic evidence of the condition of the roof following Gustav and the condition of

---

[30] *Id.*
[31] *See Allstate Ins. Co. v. Gen. Elec. Co.,* No. CIV.A. 00-0523, 2002 WL 34373485, at *6 (W.D. La. Feb. 4, 2002) (excluding an expert who failed to perform to substantiate opinions regarding the need for appliance and wiring replacement).
[32] Rec. Doc. 23-14.
[33] Rec Doc. 45-1, p. 283.
[34] Rec. Doc. 45-1, p. 49-55; Rec. Doc. 45-2; Rec Doc. 45-3.
[35] Rec. Doc. 23-14, p. 45
[36] *Id.*
[37] Rec. Doc. 45-1, p. 49-55; Rec. Doc. 45-2; Rec Doc. 45-3.

the roof following the subject event would confuse the jury and that these photos cast doubt on the reliability of the opinion that the roof requires replacement due to the subject event. Additionally, regarding Crawford's conclusion that all seven air conditioning units in the residence had to be replaced, Crawford's methodology failed to account for units which were operational and had been previously replaced.[38]

Overall, the Court finds that there is an analytical gap between the data and the opinion proffered.[39]  The methodology employed by Crawford, namely a visual inspection three years after the damage-causing event, without taking into account repairs that had been made and without testing the operational status of systems, is simply unreliable.[40]

## IV.    CONCLUSION

For the above reasons, QBE Specialty Insurance Company's *Daubert Motion*[41] is hereby GRANTED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>May 11, 2021</u>.

*/s/ Shelly D. Dick*

**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[38] Rec. Doc. 23-14, p. 120: 5-18.
[39] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997).
[40] *See Lightell v. State Farm Fire and Casualty Co.,* No. 08-4393, 2009 WL 5217087 at *2 (E.D.La. Dec. 31, 2009); *Lombardo v. State Farm Fire & Cas. Ins. Co.,* 09-512, 2010 WL 2399350 (E.D. La. June 8, 2010).
[41] Rec. Doc. No. 24.

66423