UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CLEO FIELDS

VERSUS

QBE SPECIALTY INSURANCE COMPANY

CIVIL ACTION

19-209-SDD-SDJ

**RULING**

This matter is before the Court on the *Motion for Summary Judgment*[1] filed by Defendant, QBE Specialty Insurance Company ("QBE"). Plaintiff Cleo Fields ("Fields") filed an *Opposition*[2] to this motion, to which QBE filed a *Reply*.[3] Fields also filed a *Supplemental Memorandum in Opposition*[4] to the motion. For the following reasons, the Court finds that the *Motion* shall be GRANTED.

**I.    FACTUAL BACKGROUND**

The following facts are undisputed: on June 28, 2016, lightning struck Fields' home at 570 Highland Crossing in Baton Rouge, Louisiana, causing significant damage.[5] Defendant, QBE, insured the home against such an event; Fields made a claim for damages on June 30, 2016.[6] The parties agree that, in the almost five-year period since the strike, QBE has paid Fields a total of $1,018,452.31 -- $443,452.31 for property damage to the dwelling, $500,000 for damage to personal property, and

---

[1] Rec. Doc. No. 23. QBE subsequently substituted its *Memorandum in Support* to comply with local rules, and the correct copy appears at Rec. Doc. No. 26.
[2] Rec. Doc. No. 39.
[3] Rec. Doc. No. 44.
[4] Rec. Doc. No. 90.
[5] Rec. Doc. No. 1-1.
[6] Rec. Doc. No. 23-5, p. 2, ¶ 7.
66561

$75,000 for additional living expenses.[7] Fields filed this suit on June 27, 2018 in the 19th Judicial Court for the Parish of East Baton Rouge, contending that QBE breached the insurance contract by failing to pay for all damages covered and due under the policy and for failing to pay in a timely fashion, among other allegations. QBE removed the suit to this Court on April 9, 2019.[8]

In its *Motion for Summary Judgment*, QBE argues that, though it repeatedly requested "support documentation from Fields for portions of his claim,"[9] he never produced any. Specifically, QBE avers, Fields "still has not produced evidence he was undercompensated for covered losses under the Policy."[10] In his *Opposition*, Fields counters that he has, in fact, "submitted sufficient evidence,"[11] citing the report prepared by his proffered engineering expert, John Crawford. That report will not be considered among the evidence on this motion, however, because the Court previously excluded it, for the reasons provided in its *Ruling* on QBE's *Daubert Motion*.[12]

QBE demonstrates that its adjuster conducted an initial inspection of Fields' residence on July 11, 2016 after he made his claim for damages.[13] In recognition of the complexity of assessing lightning-related damage, QBE escalated Fields' claim, putting adjuster AJ Ormsby ("Ormsby") in charge of coordinating claim investigation and adjustment of the loss.[14] On July 19, 2016, Ormsby wrote Fields, saying, "As I

---

[7] Rec. Doc. No. 23-2, p. 2 ¶ 9, 12, 15; Rec. Doc. No. 39-6, p. 3 ¶ 9, 12, 15.
[8] Removal was proper pursuant to 28 U.S.C. § 1332 – Fields is a citizen of Louisiana, while QBE is a citizen of Pennsylvania and New York for purposes of diversity jurisdiction (Rec. Doc. No. 1, p. 4).
[9] Rec. Doc. No. 26, p. 2.
[10] *Id*.
[11] Rec. Doc. No. 39, p. 2.
[12] Rec. Doc. No. 87.
[13] Rec. Doc. No. 23-5, p. 2, ¶ 10.
[14] Rec. Doc. No. 23-7, p. 7.
66561

understand, you have engaged your contractor to assess and begin repairs. Please provide me with a proposal for the repairs. If you have any analysis of electrical or structural damage, please share that with us as well, as this may expedite our confirmation of the scope of damage, mode of necessary repair and associated cost."[15] QBE argues that Fields "failed to ever produce"[16] the requisite support documentation and calls for the dismissal of his claims against QBE because, it argues, he lacks evidence to support any of them.

Apart from Crawford's *Report*, the evidence that Fields puts forth to oppose summary judgment is scant. Moreover, Fields' *Opposition* focuses almost entirely on his property damage claim. With respect to his claims for Additional Living Expenses ("ALE") and damage to his personal property, Fields does not dispute that he was paid by QBE; he offers only the conclusory statement that he was not "timely" or "fully" paid, without providing further explanation or evidence. Overall, having considered the parties' briefs and evidence as well as the applicable law, the Court finds that, for the reasons discussed below, QBE's *Motion for Summary Judgment* shall be GRANTED.

## II.    LAW

### A. Motions for Summary Judgment

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[17] This determination is made "in the light most favorable to the

---

[15] *Id*.
[16] Rec. Doc. No. 26, p. 4.
[17] FED. R. CIV. P. 56(a).
66561

opposing party."[18] A party moving for summary judgment "'must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.'"[19] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[20] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[21]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[22] All reasonable factual inferences are drawn in favor of the nonmoving party.[23] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[24] "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to

---

[18] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).
[19] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[20] *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[21] *Willis v. Roche Biomedical Lab., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).
[22] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[23] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[24] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

66561

support the complaint.""[25]

### B. Analysis

#### 1  Personal Property Damage

Fields' QBE insurance policy sets forth a limit of $500,000 in coverage for personal property.[26] It is undisputed that QBE has paid Fields $500,000 for losses covered under the policy's Coverage C – Personal Property provision.[27] In his *Petition*, Fields alleges that QBE is liable for "failing to pay for all damages covered and due under the policy" and "[f]ailure to pay plaintiff timely."[28] QBE moves for summary judgment on Fields' personal property claim, arguing that it has already paid the policy limit and that "Fields has offered no evidence that the 'Coverage C' payments he received totaling $500,000 were untimely paid to him."[29]

There is no dispute that the policy limit was paid; the dispute concerns whether the payment of the policy limit was timely. In his *Opposition*, Fields agrees that QBE tendered the policy limit for personal property but maintains that "the evidence is equally clear that such policy limits were not tendered until May 10, 2017, eleven months after the lightning strike."[30] Fields cites a May 10, 2017 email from QBE's adjuster, AJ Ormsby ("Ormsby"), indicating that the policy limit of $500,000 would be met by QBE's $305,787.41 additional payment.[31] What Fields does not do, however, is explain how the payment of policy limits

---

[25] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).
[26] Rec. Doc. No. 23-6, p. 5 (reflecting a limit for Coverage C – Personal Property of $500,000).
[27] *See* Rec. Doc. No. 23-2, p. 2, ¶ 12, and Rec. Doc. No. 39-6, p. 3, ¶ 12. See also Rec. Doc. No. 39, p. 29 ("Mr. Fields does not dispute that, eventually, QBE paid him the policy limit of $500,000.00 for his personal property claims").
[28] Rec. Doc. No. 1-1, p. 4.
[29] Rec. Doc. No. 26, p. 19.
[30] Rec. Doc. No. 39, p. 29.
[31] Rec. Doc. No. 23-7, p. 136.
66561

as of May 10, 2017 was in some way not timely. Fields asserts that "during the first half of 2017, QBE had stopped communicating with him, sometimes for months at a time, and that QBE's adjuster 'was off the grid,'"[32] arguing that this lack of communication from QBE raises a genuine issue of material fact as to whether QBE's payment was timely.

After reviewing the competent summary judgment evidence submitted by the parties, the Court finds that the record does not support Fields' characterization of QBE's adjuster as having been "off the grid." Fields cites Ormsby's *Affidavit*[33] for the proposition that there were "substantial gaps in communication" between Fields and QBE. Specifically, Fields points to "gaps in communications between December 30, 2016 and February 27, 2017; February 27, 2017 and May 10, 2017; May 10, 2017 and August 2017"[34] and notes that Ormsby describes "no communications with Mr. Fields after August 2017."[35] Of course, only the pre-May 10, 2017 "gaps" are relevant to Fields' claim, since the policy limit was paid in full by that date. And, Fields' own *Opposition* contains argument and evidence disproving these "gaps"; he states, for example, that "[t]hroughout the claim process, the parties engaged in frequent communications regarding his ALE claim with a policy limit of $100,000.00," noting that, "[o]n March 26, 2017, QBE sent a letter to Mr. Fields . . . ."[36] The record does reflect that, on April 12, 2017, Fields sent Ormsby an email stating, "I've made several good faith attempts to reach you but to no avail. Can't get calls or emails returned to discuss claims that have been pending with your company for more than 8 months."[37] Additionally, the record reflects that on January

---

[32] Rec. Doc. No. 39, p. 29.
[33] Rec. Doc. No. 23-5.
[34] Rec. Doc. No. 39, p. 27, n. 68.
[35] *Id*.
[36] *Id*. at p. 28.
[37] Rec. Doc. No. 23-7, p. 134.
66561

10, 2017, Fields sent Ormsby an email with the subject "Offer to settle" wherein he offered to settle all personal property claims for $500,000 (the amount ultimately paid by QBE by May 10, 2017).[38]

Even viewing this evidence in the light most favorable to Fields as the non-movant, the Court does not view it as probative of an untimely payment by QBE. Fields does not offer legal support for his contention that the payment was "late," other than his own conclusory say-so. The policy provides that "loss will be payable 60 days after we receive your proof of loss and reach an agreement with you."[39] Louisiana law provides that an insurer "shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured."[40] Fields does not explain when, in his view, the $500,000 payment *should* have been made by QBE. He does not offer a date as of which proof of loss was provided and an undisputed amount agreed upon. In its *Statement of Undisputed Material Fact*, QBE states that "Cleo Fields has not submitted receipts totaling $500,000 in repairs for personal property."[41] Fields neither admits nor denies this, offering only that "[n]o response is required as Defendants fails [sic] to cite to any evidence to support this contention."[42] It is not sufficient for Fields to assert that a genuine issue of material fact exists as to the timeliness of payment; he must provide evidence that demonstrates an actual dispute. He has not done so.

Likewise, Fields' assertion that QBE was neglectful of his claim is belied by the record. QBE attaches to its *Reply* what it calls "the correspondence in its entirety,"[43]

---

[38] Rec. Doc. No. 23-7, p. 127.
[39] Rec. Doc. No. 23-6, p. 21.
[40] La. R.S. § 22:1892.
[41] Rec. Doc. No. 23-2, p. 2, ¶ 13.
[42] Rec. Doc. No. 39-6, p. 3, ¶ 13.
[43] Rec. Doc. No. 44, p. 7.
66561

arguing that it "completely contradicts the picture Fields attempts to paint."[44] After reviewing the 361 pages of correspondence, the Court agrees. The voluminous correspondence between Fields, Ormsby, outside vendors and contractors, and other QBE employees, reflects an ongoing effort to adjust Fields' claim. And while Fields accuses QBE of being nonresponsive, it is clear that, on at least several occasions, it was QBE who sought information from Fields, to no avail.[45]

Ultimately, the Court agrees with QBE that "Fields has not submitted evidence of late payments for personal property loss."[46] Accordingly, QBE's *Motion for Summary Judgment* shall be granted as to Fields' claims related to personal property.

### 2  Additional Living Expenses ("ALE")

In his *Petition*, Fields alleges that QBE "fail[ed] to timely and properly pay all alternative living expenses [sic]."[47] The facts related to this claim are not disputed. First, the parties concur that QBE has paid Fields $75,000.00 for covered losses under Coverage D of the insurance policy ("Loss of Use").[48] Thus, according to the facts stipulated to by the parties, there was no failure to pay. Likewise, the parties agree that

---

[44] *Id*.
[45] *See, e.g.,* Rec. Doc. No. 23-7, p. 132 ("That item remains outstanding, pending receipt of appropriate proof of that being a recoverable loss related expense"); *Id*. at p. 137 ("If any additional proof on the generator to warrant additional consideration. You had mentioned that you sent something on this, but I have not seen this"); *Id*. at p. 8 ("Please provide the contact information for your contractors and/or technicians to me with copies to the above noted engineers to coordinate an effective and efficient inspection and loss analysis"); *Id*. at p. 9 ("I am following up on our phone call regarding the inspection at your residence. If you would please send me the contact information for the various vendors involved in the repairs needed to your Lutron lighting system as well as your other automation equipment (audio/video), HVAC equipment, pool equipment, video surveillance equipment and appliances"). *See also* Fields' admission that QBE requested evidence of ALE expenditures repeatedly and he never complied (Rec. Doc. No. 39-6, p. 3-4). Additionally, Fields admits that he has not furnished receipts demonstrating actual repairs equaling the amount paid by QBE for property damage; he claims that his burden is met by the Crawford report, which he did not obtain until 2020, almost four years after the lightning strike (Rec. Doc. No. 39-6, p. 3). Clearly, Fields' cooperation was an issue throughout the adjustment process.
[46] Rec. Doc. No. 23-2, p. 2 ¶ 14.
[47] Rec. Doc. No. 1-1, p. 4.
[48] Rec. Doc. No. 23-2, p. 2, ¶ 15; Rec. Doc. No. 39-6, p. 3, ¶ 15.
66561

the insurance policy sets forth "an express obligation to provide detailed repair estimates and receipts of ALE expenditures within 60 days of QBE's request."[49] It is undisputed that QBE first made that request in an October 14, 2016 letter.[50] Fields admits that he did not provide any receipts for ALE expenditures within 60 days of that letter.[51] He also admits that QBE sent follow-up communications requesting ALE receipts on October 17, November 8, and March 27, 2016, and that he did not, at any point either before or after filing this suit, provide them.[52]

With the above-stated facts undisputed, QBE argues that summary judgment should be granted as to Fields' claims related to ALE. In his *Opposition*, Fields does not identify any genuine issues of material fact as to his ALE claim that could prevent summary judgment. His opposition is limited to the complaint that, although QBE sent him a letter on March 26, 2017 suggesting that $60,000 as a possible payment for loss of use, he "did not receive payment on his ALE claim until May 10, 2017."[53] But that letter does not evidence QBE's satisfactory proof of loss that would trigger the statutory 30 day payment period; in fact, the relevant paragraph states that "there are no records of expense to verify the loss"[54] and notes that the square-footage based calculation Fields

---

[49] Rec. Doc. No. 23-2, p. 2, ¶ 18; Rec. Doc. No. 39-6, p. 3, ¶ 18.
[50] Rec. Doc. No. 23-2, p. 2, ¶ 19; Rec. Doc. No. 39-6, p. 3, ¶ 19.
[51] Rec. Doc. No. 23-2, p. 3 ¶ 20; Rec. Doc. No. 39-6, p. 3, ¶ 20.
[52] In its *Statement of Undisputed Material Fact*, QBE states that "[t]o date, Mr. Fields has not provided any receipts evidencing ALE expenditures" (Rec. Doc. No. 23-2, p. 3, ¶ 24). Although Fields's response to that statement is not "admitted" but instead "qualified," nothing in his response suggests an actual dispute or denial of QBE's statement. Fields explains his "qualified" response with the statement that "QBE's internal documents reflect 'Agreed for 5 months loss of use based on $15,000/month. Intermittent availability of power, AV systems and appliances required insured to use secondary homes for periods ($75,000).'" Rec. Doc. No. 39-6, p. 4, ¶ 24. Nothing in this statement is responsive to QBE's proffered undisputed fact that Fields never provided ALE receipts.
[53] Rec. Doc. No. 39, p. 29.
[54] Rec. Doc. No. 23-7, p. 132.
66561

provided "does not present evidence of what your additional expenses were."[55] Nor is Fields' own self-serving statement that QBE "shut down on [him]"[56] evidence of untimely payment. Fields was contractually obligated to provide proof of loss within 60 days of QBE's request. He failed to do so. Nevertheless, QBE "paid Fields $75,000 in lost rental value."[57] Based on the undisputed facts and the evidence in the record, summary judgment shall be granted as to Fields' ALE claim.

### 3  Property Damage

The parties agree that QBE has paid Fields $443,452.31 for damage to his residence under the policy's Coverage A provision ("Dwelling").[58] Fields alleges that QBE has failed to pay for all covered property damage and that it failed "to timely procure qualified professionals to properly assess all of the damages."[59] In its *Motion for Summary Judgment*, QBE highlights a provision in the policy that states as follows: "[QBE] will pay no more than the actual cash value of the damage until actual repair or replacement is made."[60] The parties agree that Fields has not submitted receipts documenting $443,452.31 in actual repair or replacement costs for dwelling loss.[61] QBE contends that, given the absence of any evidence showing that the actual cash value of Fields' dwelling losses exceeds $443,452.31, summary judgment should be granted on Fields' property damage claim.

---

[55] *Id*.
[56] Rec. Doc. No. 39-6, p. 8 ¶ 22.
[57] Rec. Doc. No. 26, p. 18.
[58] Rec. Doc. No. 23-2, p. 2, ¶ 9; Rec. Doc. No. 39-6, p. 3, ¶ 9.
[59] Rec. Doc. No. 1-1, p. 4.
[60] Rec. Doc. No. 26, p. 19 (citing Rec. Doc. No. 23-6, p. 21).
[61] Rec. Doc. No. 23-3, p. 2, ¶ 10; Rec. Doc. No. 39-6, p. 3, ¶ 10 ("Plaintiff admits that he has not submitted 'receipts' totaling $443,452.31 in actual repairs for dwelling loss").
66561

For his part, Fields contends that "he submitted a further satisfactory proof of loss and evidence of damage, in part, through the Crawford Report . . . whereby he concluded that the total repair cost estimate attributable to the lightning strike, including all necessary and related repairs, totaled $1,654,522,76."[62] The Court previously excluded opinions by Crawford as unreliable. Fields wrongly argues that the Court "did not exclude Mr. Crawford's testimony in its entirety."[63] The Court granted the *Daubert* motion and excluded opinion testimony by Crawford. Fields further argues that the Court's exclusion of Crawford has "no significant bearing" on the outcome of the instant *Motion for Summary Judgment*, because Fields "has easily satisfied his burden . . . despite the Court's decision."[64] The Court disagrees. Without Crawford's report and testimony, Fields has virtually no evidence whatsoever of uncompensated losses.

Fields also contends that QBE's entire approach to his claim is misguided. According to the policy, he argues, QBE is obligated to pay him up to the actual cash value of any property damage, with additional payments possible based on evidence of actual repair or replacement. Per Fields, QBE "failed to undertake any such analysis"[65] of the actual cash value of his damage; instead, he argues, it has "put the onus of adjusting the claim onto the homeowner" by "insisting that Mr. Fields provide receipts and invoices of actual expenditures made."[66] Although Fields repeatedly complains that QBE's conduct was improper, at no point does he provide competent summary judgment evidence that he was actually undercompensated for his property damage, even assuming that actual

---

[62] Rec. Doc. No. 39-6, p. 3, ¶ 10.
[63] Rec. Doc. No. 90, p. 2.
[64] *Id*. at p. 6.
[65] Rec. Doc. No. 39, p. 17.
[66] *Id*. at p. 18-19.
66561

cash value is the relevant metric. Without the Crawford Report, Fields' only evidence of under compensation are his allegations that QBE owes him more money, which are not sufficient to defeat summary judgment. The United States Court of Appeals for the Fifth Circuit held as much under similar circumstances in *Bayle v. Allstate Ins. Co.*[67] In that case, homeowners sued Allstate, their insurance company, for allegedly undercompensating them for wind damage to their home caused by Hurricane Katrina. Like the case at bar, *Bayle* featured a summary judgment motion by an insurance company. While not analogous in every respect, *Bayle* is apposite insofar as, like Fields, the plaintiffs therein offered an expert report and argued (as summarized by the court) that "[t]he mere existence of these two competing figures" – theirs and the insurance company's – "signals that there exists a genuine issue of material fact which precludes summary judgment."[68] On this issue, the *Bayle* court held as follows:

> Allstate put forward sufficient evidence in support of its motion for summary judgment to establish that all wind-caused structural damage to the Bayles' house was fully compensated. Not only did the Bayles fail to counter with any rebuttal evidence to establish the existence of as-yet uncompensated damage caused by wind, the Bayles *also* failed to proffer any evidence that the *quantum* of damages they had already received from Allstate for wind-caused damage was insufficient. The Bayles have cited no authority, and we have found none, to support the proposition that the shifting evidentiary burden of production in these insurance suits somehow absolves the insureds from the traditional rule "[u]nder Louisiana law, [that] the plaintiff must prove damages with reasonable certainty...." Accordingly, the district court, correctly ruled that the Bayles were not entitled to additional payments for wind damage under their homeowners policy.[69]

Likewise here, it is not disputed that QBE has already paid Fields $443,452.31 for property damage, an amount which exceeds the documented repairs and replacements

---

[67] 615 F.3d 350, 353 (5th Cir. 2010).
[68] *Id*. at 362 (5th Cir. 2010).
[69] *Id*. at 363 (emphasis original, internal citation omitted).
66561

undertaken by Fields.[70] And, as in *Bayle*, Fields has not come forward with admissible evidence of uncompensated property damage. Fields has offered no evidence in opposition to summary judgment of the actual cash value of potentially covered loss that QBE has not paid. Applying the Fifth Circuit's reasoning in *Bayle*, this Court finds that the lack of evidence of uncompensated property damage or of the actual cash value of any such damage is fatal to Fields' claims.

Fields disputes the relevance of *Bayle*. First, he argues, *Bayle* is distinguishable because, unlike the plaintiffs therein, he is not seeking to recover an amount exceeding the actual cash value of his home. The Court fails to see how this renders *Bayle* inapposite; regardless of the relationship between the amount sought and the actual cash value, *Bayle* stands for the proposition that the plaintiff is obligated to provide rebuttal evidence of the insufficiency of the loss adjustment. Even if Fields is not seeking to recover above and beyond the actual cash value of his residence, he cannot defeat summary judgment by simply insisting that QBE's loss adjustment and the payments made are insufficient, without evidence of such.

On the topic of evidence, Fields also attempts to distinguish *Bayle* by arguing that, unlike the plaintiffs therein, he actually *has* "put forth substantial evidence that he has incurred as-yet uncompensated damage to his dwelling."[71] As evidence, Fields cites "Mr. Crawford's report and testimony"[72] (both of which have been excluded), "as well as QBE's own admissions."[73] The "admission" that Fields cites, however, is from the May 10, 2017

---

[70] *See* above n. 51.
[71] Rec. Doc. No. 39, p. 20.
[72] *Id*.
[73] *Id*.
66561

email sent by QBE's adjuster AJ Ormsby, wherein Ormsby notes "[r]emaining outstanding potential claim recovery"[74] for the following items:

> - Bernhard Bros gas line repair, where we anticipate confirmation of the causal relationship of repairs to the loss ($13,850.00)
> - Corvallis scope, work detail and cost.
> - Clean Pro - floor polishing ($17,636.40)
> - If any additional proof on the generator to warrant additional consideration. You had mentioned that you sent something on this, but I have not seen this,

As an initial matter, the Court notes that two of the items on this list – "Corvallis" and the generator – are in fact requests for substantiation by QBE; elsewhere in the record, Orsmby states that the Corvallis "item remains outstanding, pending receipt of appropriate proof of that being a recoverable loss related expense."[75]  The record does not reflect that Fields ever provided that information during the adjustment process, and he does not produce it in opposition to summary judgment. This email is evidence of QBE's requests for documentation of losses. In the Court's view, the fact that Fields had not yet received payment on these "potential" recoveries between the time of Ormsby's email in May 2017 and the filing of his lawsuit on June 27, 2018[76] does not demonstrate that Fields was "uncompensated"[77] for these sources of property damage, as he claims. Instead, as stated above, the email evidence cited by Fields demonstrates an ongoing effort to adjust his claim – an effort that was brought to a halt by his filing suit.

      QBE has presented evidence of the loss payments made and Fields has failed to bring forth competent summary judgment evidence to substantiate that his losses

---

[74] Rec. Doc. No. 23-7, p. 136.
[75] Rec. Doc. No. 23-7, pp. 130, 132.
[76] Rec. Doc. No. 1-1, p. 2.
[77] Rec. Doc. No. 39, p. 20.
66561

exceeded the payments made by QBE. Thus, the Court finds that QBE's *Motion for Summary Judgment* shall be granted and Fields' claims -- including his claim of statutory bad faith -- dismissed with prejudice.[78]

### III.  CONCLUSION

For the above reasons, QBE Specialty Insurance Company's *Motion for Summary Judgment*[79] is hereby GRANTED and Fields' claims against QBE dismissed with prejudice.

**IT IS SO ORDERED.**

*Judgment* to be entered accordingly.

Signed in Baton Rouge, Louisiana on May 25, 2021.

**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[78] "Louisiana law instructs that in order for a claim of statutory bad faith to survive, it must be based on a valid underlying claim." (*Naquin v. Elevating Boats, L.L.C.,* 817 F.3d 235, 240 (5th Cir. 2016)). As discussed above, the Court finds that QBE has demonstrated that it is not liable for breach of contract; consequently, Fields has no valid underlying claim on which to base a bad faith claim. See also *Bayle*, 615 F.3d 350, 363 (5th Cir. 2010) ("Breach of contract is a condition precedent to recovery for the breach of the duty of good faith, and we agree with the district court that Allstate did not breach its insurance contract with the Bayles. Therefore, the district court properly denied the Bayles' claim for statutory penalties").
[79] Rec. Doc. No. 23.
66561